IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 2, 2020

## IN RE GRACIE H. Y. ET AL.

**Appeal from the Chancery Court for Lawrence County**
**No. 18-18495       Stella L. Hargrove, Judge**

_____

### No. M2019-00639-COA-R3-PT

_____

Ashley H. ("Mother") appeals the March 2019 order of the Lawrence County Chancery Court ("Trial Court") terminating her parental rights to the minor children, Noah H. and Gracie H. Y. (collectively, "the Children"). Bobby H. ("Father") surrendered his parental rights to the Children prior to trial and did not revoke his surrender. Upon petition of the Tennessee Department of Children's Services ("DCS"), the Trial Court terminated Mother's parental rights to the Children upon the statutory grounds of abandonment by failure to visit prior to her incarceration, abandonment by wanton disregard, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plans, persistent conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility of the Children. The Trial Court further found that termination of Mother's parental rights was in the Children's best interest. Mother timely appealed. We reverse the statutory ground of abandonment by failure to provide a suitable home. We affirm the Trial Court's judgment in all other respects including the termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Stacie L. Odeneal, Lawrenceburg, Tennessee, for the appellant, Ashley H.

Herbert H. Slatery, III, Attorney General and Reporter, and Jeffrey D. Ridner, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

## Background

In July 2017, DCS filed a petition for temporary legal custody of the Children in the Lawrence County Juvenile Court ("Juvenile Court"). On the same day, the Juvenile Court entered a Bench Order placing the Children in the custody of DCS. DCS had received a referral alleging lack of supervision and drug-exposed child concerning the Children due to Mother's drug use. DCS subsequently received another referral concerning Noah, alleging physical abuse by Mother's boyfriend, Brian R. According to the DCS investigator, Lynn Short, Mother had informed her that Noah had been crying, and she went to the kitchen to fix him a bottle. When she came back, Mother saw Noah had a bloody lip, and Brian told her he had "popped the child in the mouth." Mother and Brian argued, and when she locked herself and the Children in the bathroom, Brian "kicked in the door." Mother then contacted law enforcement. DCS further alleged that in January 2017 when Noah was approximately nine months old, he had tested positive for methamphetamine and cocaine.

Mother received a copy of the Criteria & Procedures for Termination of Parental Rights in July 2017. A DCS case manager explained the contents of the documents to Mother on that day. In August 2017, Mother waived her adjudicatory hearing and stipulated that a factual basis existed to believe the Children were dependent and neglected due to Mother's incarceration.

In August 2017, DCS developed a permanency plan for the Children, which the Juvenile Court subsequently approved as being reasonably related to the reasons necessitating foster care and in the Children's best interest. The August 2017 permanency plan provided that Mother would complete the following requirements: provide safe, appropriate, and stable housing and provide proof thereof; notify DCS regarding a change in housing or telephone number; comply with the rules of her probation; have a stable, legal income; notify DCS within seven days of any individuals residing in her home; complete budgeting services; pay child support; complete homemaker services; sign releases with provider agencies; complete a mental health assessment and follow all recommendations; complete an alcohol and drug assessment and comply with all recommendations; complete domestic violence counseling; visit the Children regularly and comply with parenting guidance; and comply with and pass random drug screens. The plan reflects that Mother participated in the development of the plan by telephone.

A dispositional hearing was conducted in October 2017, and the Juvenile Court ordered that the Children would remain in DCS custody. DCS developed two more permanency plans in January 2018 and May 2018 with the same requirements as the first

plan, which the Juvenile Court approved. A fourth permanency plan was developed in December 2018 with the same requirements as the previous plans and an additional requirement that Mother resolve all pending legal issues and not incur new charges.

In June 2018, DCS filed a petition to terminate Mother's parental rights in the Trial Court.[1] The Trial Court conducted a trial on two consecutive days in February 2019.[2] Thereafter, the Trial Court entered an extensive order with the following findings of fact and conclusions of law:

FINDINGS OF FACT AND CONCLUSIONS OF LAW

A Brief History of the Case: [Mother] is 23 years old and completed the eleventh grade. She is the mother of Noah [H.] (Noah), who is 34 months old, and Gracie [H.Y.] (Gracie), who is now 21 months old. Trial Exhibit 1 [the Children's birth certificates] reflects that [Father] is the father of each child. On February 20, 2019, [Mother] named another male other than [Father] as the father of Gracie. Undisputedly, this is the first time ever that [Mother] names a different father. A search of the putative registry reflects that no person other than [Father] claims paternity of either child. [Mother] is still married to [Father]. The Court questions the credibility of [Mother], as to her last minute assertion that [Father] is not the father of Gracie.

Testimony will reveal that from May, 2017, and July, 2017, DCS received three referrals concerning the children, including referrals of (1) drug exposed child, (2) physical abuse, and (3) lack of supervision. Gracie was born May **, 2017; Noah was born April **, 2016. Therefore, during these three months, Gracie was a newborn, and Noah was one year old.

Subsequent to a referral to DCS on July 24, 2017, a Petition for Temporary Custody was filed in the Lawrence County Juvenile Court on July 26, 2017. On July 26, 2017, a Bench Order was entered and both children were placed in the temporary legal custody of DCS. On August 24, 2017, [Mother] stipulated that the children were dependent and neglected. The record reflects that [Father] did not appear for this hearing, and he did not appear for any hearings beyond July 28, 2017. On August 24, 2017, an Order was entered continuing the legal custody of the children

---

[1] Although the termination petition included Father as a party, Father had surrendered his parental rights prior to trial.

[2] Mother surrendered her parental rights to the Children but timely revoked that surrender.

- 3 -

in DCS. On October 2, 2017, a Final Order of Disposition was entered, continuing custody of the children in DCS. Both children have remained in the custody of DCS as of the date of trial.

The Statutory Grounds for Termination of the Parental Rights of [Mother] are:

Ground 1: Abandonment by Incarcerated Parent — Failure to Visit, pursuant to Tenn. Code Ann. §36-1-113(g)(1) and §36-1-102(1)(A)(iv), (1)(C) and (1)(E).

Ground 2: Abandonment by Incarcerated Parent due to Wanton Disregard for the Children, pursuant to Tenn. Code Ann. §36-1-113(g)(1) and §36-1-102(1)(A)(iv).

Ground 3: Abandonment by Failure to Provide Suitable Home, pursuant to Tenn. Code Ann. §36-1-113(g)(1) and §36-1-102(1)(A)(ii).

Ground 4: Substantial Noncompliance with Permanency Plans, pursuant to Tenn. Code Ann. §36-1-113(g)(2) and §37-2-403(a)(2).

Ground 5: Persistence of Conditions, pursuant to Tenn. Code Ann. §36-1- 113(g)(3).

Ground 6: Failure to Manifest Ability and Willingness Personally to Assume Legal and Physical Custody or Financial Responsibility, pursuant to Tenn. Code Ann. §36-1-113(g)(14).

The Statutory Four-Month Period Applicable to [Mother]: The four-month statutory period, where applicable, prior to the filing of the Petition for termination is disputed. The two periods are set out herein. The Court finds that its ruling is the same, regardless of which statutory period is correct. The two periods are either:

(1) A consecutive period from September 29, 2017 to January 29, 2018, or

(2) An aggregated period of October 29, 2017, to January 29, 2018, plus the period of February 23, 2018, to March 27, 2018.

The Hearings: On February 11, 2019, prior to [Mother] executing a surrender of her parental rights, DCS called Erica Ivey, a Clinical Supervisor with Health Connect America, as the first witness.

On February 20, 2019, DCS called the following witnesses: Lynn Short, an Investigator for DCS; Tina Waits, an Investigator for DCS; and [Mother].

On February 21, 2019, DCS called [G.M.], foster mother of the children, Christian Krasowski, a Family Case Worker for DCS and Nikiya (Nikki) Esmond, a receptionist for Health Connect America. Counsel for [Mother] called Glenda York, the mother of [Mother], as well as [Mother].

The Demeanor of [Mother]: The Court feels compelled to discuss the attitude and demeanor of [Mother], because the Court has never witnessed such demeanor in a termination case. [Mother] was late arriving to court every day. She showed no interest in the testimony of witnesses, and was constantly on her cell phone. On February 21, 2019, the Court took her cell phone away until the trial ended. When [Mother] was not on her cell phone, she was constantly yawning, laughing, and trying to engage her lawyer in conversation while she was smiling. She never displayed any interest in what was going on. The Court asked [Mother] if she understood the seriousness of the trial. She indicated that she did.

On the afternoon of February 20, 2019, [Mother] asked the Court if she could "waive her trial." The Court encouraged her to stay with the trial and have her lawyer defend her and present her case so the Court could make a good decision. However, the Court remained concerned that [Mother] was not demonstrating any real interest in presenting a defense to the serious allegations against her.

The Court is mindful that [Mother] has some history of mental illness and is currently supposed to be on medication. She will testify that she receives a SSI check for "mild mental retardation." However, the Court finds that [Mother] understood all questions of counsel and answered appropriately. When DCS called her as a witness on February 20, 2019, she was on the stand for many hours. The Court observes that she had no problem with memory; she never asked for a question to be repeated, and she promptly responded to questions both from DCS and from her lawyer.

[Mother] told the Court she forgot to take her medication on February 21, 2019. On this day, she was more than 50 minutes late to

- 5 -

court. She yawned continuously throughout the morning. The Court finds she had absolutely no interest in the trial.

Asked by the Court on February 21, 2019, if she could pass a drug screen, she responded that she might show a false positive for Adipex. She informed the Court that "this could happen." [Mother] again denied using illegal drugs. After the Court explained to her penalties of perjury, [Mother] testified that she had "done" heroin and methamphetamine two to three weeks ago. The Court ordered [Mother] to submit to a urine drug screen. The drug screen, positive for both methamphetamine and opiates, was sent to a lab for a more specific reading as to "opiates." Late filed Exhibit 15 [laboratory drug test results] reflects that [Mother] was positive for methamphetamine and amphetamine.

On February 20, 2019, [Mother] testified that her last drug use was just prior to her last incarceration. The record reflects she last went into custody on March 28, 2018. Only after being advised of penalties for perjury, did [Mother] admit her current use of illegal drugs.

[Mother] testified that she is currently six weeks pregnant.

Ruling on the Statutory Grounds:

Abandonment by Incarcerated Parent by failure to visit and Abandonment by Incarcerated Parent due to Wanton Disregard of the Children:

* * *

The following testimony supports the ground of termination of the parental rights of [Mother], as to failure to visit:

Erica Ivey (Ms. Ivey) is a Clinical Supervisor for Health Connect America. Health Connect America contracts with DCS to provide community mental health services, including supervised therapeutic visitation for parents with their children, homemaker services and family violence services. Services are usually two hours each per service, per month, in the home of the parent.

Ms. Ivey testified that Health Connect began attempting to contact [Mother] on September 22, 2017. The first visitation was set up for September 26, 2017. At this visitation, [Mother] had to be asked to put

away her cell phone. From September 26, 2017, to January 3, 2019, Health Connect attempted to provide services for [Mother]. During this time, Ms. Ivey testified of being able to set up with [Mother] just three visitation services: on September 26, 2017, for two hours; on November 17, 2017, for three hours and on December 26, 2017, for two hours. Only four homemaker services were accomplished: On October 25, 2017; on November 10, 2017; on November 14, 2017; and on December 11, 2017. Only three family violence services were accomplished: On October 26, 2017; on December 15, 2017; and on January 18, 2018. Each of these services is reflected by Trial Exhibit 12, Pages marked 1-10 [Health Connect Records]. The Court notes that Page 10 of the Exhibit reveals that on January 18, 2018, [Mother] "was in a defiant mood the entire session. Whenever she spoke to her mom, she berated her and cussed her out. She was constantly on her phone, was extremely unfocused and very reactive."

All attempts by Health Connect America to contact [Mother] after January 18, 2018, were unsuccessful. Trial Exhibit 12 [Health Connect Records] reflects multiple excuses for cancellation of services by [Mother], and at one point, [Mother] actually hung up on the person trying to set up services.

[Mother] does not deny the testimony of Ms. Ivey. The services provided, or offered to be provided to [Mother], were corroborated by the testimony of Christian Krasowski, a Family Service Worker for DCS.

Therefore, during both the consecutive four-month statutory period, running from September 29, 2017, to January 29, 2018, and during the aggregated period running from October 29, 2017 to January 29, 2018 plus February 23, 2018 to March 29, 2018, [Mother] visited with her children two times – on November 17, 2017, and on December 26, 2017, for a total of five hours. The record reflects that [Mother] cancelled two visits set up for October 20 and October 26, 2017; she visited only one time in November, 2017; she cancelled one of the visits in December – December 12, 2017, and she failed to visit on January 31, 2018, because she was arrested once again on January 30, 2018. Even when [Mother] was out of jail from February 22, 2018, to March 28, 2018, she never requested to visit with her children.

It is undisputed that [Mother] does not work. She draws an SSI check. The Court finds the visitation to be token visitation during each of the statutory periods.

- 7 -

Therefore, the Court finds that [Mother] failed to visit with her children during the statutory periods. Further, the Court finds that her failure to do so is willful. [Mother] was aware of her duty to visit with her children; she had the capacity to do so; she made no attempt to do so; and she has no justifiable excuse for not doing so.

The Court finds that [Mother] engaged in conduct prior to incarceration which exhibits a wanton disregard for her children's welfare. The ramifications of her criminal conduct are indicative of a broader pattern of conduct that constitutes a wanton disregard for the children's welfare.

[Mother] has wantonly disregarded her children's welfare by engaging in illegal drug use, by exposing the children to drugs and domestic violence, by failing to comply with requirements order[ed] by the juvenile court in order to regain custody of her children, by continuing her drug usage after removal of her children, and by continuing to engage in criminal activities, resulting in incarceration and continuous separation from her children.

[Mother] makes an interesting statement about the effect illegal drugs has on her body. She testified: "Any drug that goes in my system stays longer than it is supposed to. I have kidney failure on my left side." There is no medical proof in the record to back up her statement.

The convoluted, criminal record reflects that [Mother] has been in custody for a great deal of the children's lives. The Guardian ad litem expressed to the Court that she has been in custody for 56% of Noah's life, and for 90% of Gracie's life. [Mother] does not deny this. Exhibit 11 [Mother's criminal records] corroborates the allegations of DCS relative to her incarceration. She was on probation for 2 -11/29's for reckless endangerment and domestic assault of her mother, when Noah was born. His date of birth is April **, 2016. On June 17, 2016, a probation warrant was issued. Grounds included charges of manufacturing methamphetamine. An amended warrant was filed on July 8, 2016, based upon a positive drug screen on June 15, 2016, for methamphetamine, amphetamine and alprazolam. On September 16, 2018, her probation was revoked for 60 days, and her probation was extended for another 11/29. On October 18, 2016, another probation violation warrant was filed. Grounds included [Mother's] failure to report since September 14, 2016. An amended warrant was filed on December 6, 2016, based on a positive drug screen for marijuana on October 18, 2016. On December 13, 2016, her probation was fully revoked.

In the meantime, [Mother] was charged with domestic assault of [Father] on October 5, 2016. On December 9, 2016, she was charged with violation of the conditional bond in the case. On December 13, the charges were bound to the grand jury. An indictment was issued on January 5, 2017, charging [Mother] with domestic assault and violation of conditional bond. On February 9, 2017, another indictment was issued charging her again with violation of the conditional bond. On April 10, 2017, [Mother] entered a guilty plea to domestic assault and to one conditional bond violation. She received a probated sentence of 2 x 11/29.

Gracie was born on May **, 2017. [Mother] testified that she was in custody when she went into labor. She was released on probation.

On July 21, 2016, [Mother] was indicted for promotion of methamphetamine. On November 14, 2016, she entered a guilty plea to that charge and received a 4 year sentence, probated after serving 90 days. On January 26, 2018, a probation violation warrant was issued based upon a positive drug screen for methamphetamine, amphetamine and marijuana on January 3, 2018. Exhibit 10 is an internet post by [Mother] which shows a positive screen on January 3, 2018, with a notation of "fucked up." On February 22, 2018, [Mother] received a partial revocation of 30 days. On March 28, 2018, a probation violation warrant was issued based upon a positive drug screen for methamphetamine and amphetamine on March 15, 2018. On April 19, 2018, [Mother] received a partial revocation of one year.

On September 4, 2018, [Mother] was granted a furlough to Place of Hope for long-term drug treatment. Her treatment was to begin on September 6, 2018. [Mother] testified as follows: "I didn't need it (treatment). I only did it as a requirement to get my children back." "I got kicked out after 3 days. A dude gave me a note, and I threw it away rather than giving it to a staff member." [Mother] explained that she was required to turn any correspondence (from another participant in treatment) in to a staff member.

[Mother] does not dispute that she was in custody serving time for charges in three different counties from March 28, 2018, to December 4, 2018. She was in custody in jail in Lawrence County on March 28, 2018; on May 9, 2018, she was transferred to Wayne County jail for a month; she was then transferred to the Maury County jail until September 19, 2018; and she was then transferred back to Lawrence County jail once her

furlough to treatment was revoked, where she remained in custody until December 4, 2018.

* * *

The Court finds the State has carried its burden of proof by clear and convincing evidence as to each of these grounds. The Court finds that [Mother] has abandoned her children by incarceration based upon failure to visit and due to wanton disregard for the children.

Abandonment by Failure to Provide Suitable Home and Substantial Noncompliance with Permanency Plans:

The record reveals that the children have been in DCS custody for 19 months, beginning July 26, 2017. The Petition for termination was filed June 29, 2018. [Mother] has been in and out of jail a majority of the children's lives. She was incarcerated when the Petition was filed.

DCS developed four Permanency Plans to assist [Mother] in regaining custody of her children. The plans were developed on August 16, 2017, January 16, 2018, May 10, 2018, and January 7, 2019. The Plans provided for assistance by DCS with various services, including: therapeutic supervised visitation with her children, random drug screens, assistance with drug treatment, assistance with mental health treatment, visits to her home to insure the safety of the children, daily care and support for the children, medical and dental care for the children, and ongoing case management with advice and recommendations for improving [Mother's] situation and regaining custody of her children.

[Mother] failed to substantially comply with her responsibilities under the plans. Her lack of visitation has already been discussed. She has never maintained stable housing. When she is not in custody, [Mother] lives with her mother from time to time. She also lives with various males. She receives a SSI check when she is not in custody, but pays no financial support for her children. She fails to otherwise provide necessities for her children. The only contributions made by [Mother] are two trash bags of clothes she said she provided for the children when they went into custody in July of 2017. She testified: "I'm not required to pay support; I'm on SSI."

[Mother] did have an alcohol and drug assessment in October of 2017; however, she has not substantially complied with services offered by

- 10 -

Health Connect America, and has incurred probation violations for positive drug screens since her children were placed in state custody. [Mother] has never submitted to a mental health assessment and followed recommendations therefrom. She has failed to substantially comply with homemaker services. [Mother] did not substantially comply with domestic violence services. She missed all sessions scheduled for five consecutive months; then attended a last session on January 18, 2018, and while there threatened to get her children back either legally or illegally, even if it meant setting fire to the courthouse. [Mother] has repeatedly failed to comply with terms of probation.

DCS Family Service Worker, Christian Krasowski (Ms. Krasowski), testified that she went over the Criteria and Procedures for Termination of Parental Rights with [Mother] and answered any questions she had. Exhibit 8 reveals that [Mother] signed the form on July 26, 2017. Ms. Krasowski confirmed [Mother]'s noncompliance with each and every Permanency Plan. When [Mother] would use issues with insurance coverage as an excuse for not following up with services, Ms. Krasowski testified: "I tried to help her regain coverage when it lapsed — when she would respond to me." She stated that [Mother] would not stay in communication with her, and she had difficulty locating her. Ms. Krasowski confirmed the testimony of Ms. Ivey with regard to services offered to [Mother] by Health Connect America, including the last class in which [Mother] attended on January 18, 2018. This was when [Mother] in a "defiant mood["]; constantly on her phone, and cussed her mother out.

Ms. Krasowski stated that [Mother] was approved for the same services when she last got out of jail on December 4, 2018. [Mother] testified that with one exception, she was never contacted by Health Connect America once she was released from custody. Ms. Krasowski testified that beginning December 6, 2018, to January 23, 2019, there were no responses to repeated calls from Health Connect America. [Mother] did make an appointment for January 30, 2019, only to have her mother cancel it, saying [Mother] was sick. The Court does not believe [Mother], and finds that she failed to participate in services offered by Health Connect America since December 4, 2018.

[Mother] testified that she started Intensive Outpatient classes with Health Connect America in December of 2018. She was discharged on January 11, 2019, for lack of participation. She testified that she began Intensive Outpatient classes last week with Centerstone. Exhibit 13 [Centerstone records] reveals [Mother]'s prior participation in therapy at

Centerstone. Over a three-month period, from May to July of 2017, the record reveals repeated cancellations by her and "no shows." [Mother] testified: "I did not go back after July 31, 2017.["] The discharge notes dated August 7, 2017, state that she "dropped out of treatment — no contact in over 90 days."

[Mother] testified that she is "unfortunately" still married to [Father]. She testified that she was living with Brian [R.] in 2016, stating: "I was with (him) since October 5, 2016; we "dated" until July 19, 2017.["] [Brian] was charged with child abuse of Noah on July 19, 2017. On October 12, 2017, he entered a plea of guilty to misdemeanor child abuse and received a probated sentence of 11/29. A probation violation warrant, issued January 8, 2018, reflects a positive drug screen for methamphetamine, amphetamine and marijuana on December 28, 2017. An amended warrant reflects a positive screen for methamphetamine, amphetamine and marijuana on February 9, 2018. He received a full revocation on February 22, 2018.

[Mother] testified that [Brian] told her he used "meth." When asked if he used drugs in front of her, she stated: "No - not that I recall." The Court finds this testimony incredible.

[Mother] testified: "I told DCS worker, Tina Waits (Ms. Waits), "I was 'supporting' [Brian] to keep him from being a drug dealer." This is not the way Ms. Waits recalls the conversation. She testified that [Mother] told her: "She was dating him for a while and he was a drug dealer, and he'd used her phone to arrange drug buys. She wanted to resume her relationship with him and wanted to get help so they could stay together." The Court finds the testimony of [Mother] incredible.

Once she broke up with [Brian], [Mother] testified that she 'dated' Jack [D.] for a month, from October to November of 2017; and then 'dated' Johnathan [A.], from November, 2017, to January 30, 2018, but denies living with either of them. (On January 30, 2018, [Mother] was again in custody). The Court does not find [Mother] to be a credible witness, and questions her testimony of "not living with Jack [D.] and Jonathan [A.]." She testified that Jack [D.] was an alcoholic, and that Jonathan [A.] was emotionally abusive to her. She also testified that she miscarried a baby by Johnathan [A].

[Mother] testified that she wound up at Maury Regional Medical Center in January of 2018, after being at a party. She recalls that she could

- 12 -

not move, talk or breathe. Toxicology revealed the presence of fentanyl. [Mother] testified that she knew there was alcohol at the party, but didn't know fentanyl was being used. [Mother] is on felony probation, and is admittedly at a party where alcohol and illegal drugs are present.

Mother testified that she is currently living with convicted felon, Bobby [L.], and that she is six weeks pregnant with his baby. She testified that [Bobby] is "different — he's sober now — I believe people change every day."

Exhibit 9 is the criminal record of [Bobby L.]. It includes a six year probated sentence for a conviction of attempted initiation of the process to manufacture methamphetamine, in January of 2012. [Mother] testified that "he took this meth charge for his mother." [Bobby's] record also includes multiple violations of probation for DUI as well as for possession of methamphetamine. On August 15, 2013, he received a partial revocation of one year. On August 15, 2013, [Bobby] entered a plea to felony DUI and simple possession of methamphetamine. On August 15, 2014, [Bobby] was arrested for another DUI. On November 24, 2014, he entered another plea to felony DUI and received a probated sentence of two years (after serving the required minimum DUI sentence for 4th offense). On November 24, 2014, his six year methamphetamine sentence was fully revoked.

The record reflects that [Mother] made no reasonable efforts to provide a suitable home. The Court finds she has demonstrated a lack of concern for the children, to such an extent that it appears unlikely she will be able to provide a suitable home for the children at an early date. She testified as follows: She stayed with family friend, [P.L.], in 2017; after getting out of jail on April 30, 2017, she stayed with her parents for two months; then she lived with an aunt, [A.W.]; then she rented a house on Byrd Road in Lawrenceburg, under a month to month rental; then she rented a room on 420 4th Street in Lawrenceburg for two months; then in December of 2017, she rented a house on Glenn Springs Road in Lawrenceburg until March 28, 2018, when she was arrested; then when released from jail on December 4, 2018, she returned to her parent's home in Summertown; and stayed there until recently, last month, when she moved in with her boyfriend, Bobby [L.], after dating him for two and a half weeks.

The Court finds that DCS has carried its burden of proof by clear and convincing evidence as to each of these grounds. The Court finds that

- 13 -

[Mother] has failed to substantially comply with the Permanency Plans and has failed to provide a suitable home for the children.

Persistence of Conditions:

[Mother] was asked by DCS why her children came into State custody. The Court finds her response revealing. She stated: "Because of my husband's drug use — not me."

[Mother] failed to visit with her children on a regular basis in 2017 once they came into DCS custody. Even when she was not incarcerated, she did not ask to visit with the children. She failed to take advantage of services offered by Health Connect America; she violated her probation twice after the children went into custody because of positive drug screens; she failed to submit to a mental health assessment so that her mental health issues can be addressed; and she was discharged after only three days of drug treatment.

The children have been in State custody over 19 months. The Court finds that the conditions that led to the children's removal still persist, preventing the children's safe return to the care of [Mother], and other conditions exist that, in all reasonable probability, would cause the children to be subjected to further abuse or neglect, preventing the children's safe return to the care of [Mother]. Also, there is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned to [Mother] in the near future, and the continuation of the parent-child relationship greatly diminishes the children's chance of early integration into a safe, stable and permanent home.

The Court finds that DCS has carried its burden of proof as to this ground.

Failure to Manifest Ability and Willingness Personally to Assume Legal and Physical Custody or Financial Responsibility:

[Mother] has not visited the children on any regular basis; she lives from place to place; she does not help to support her children and fails to provide necessities; she has not addressed her drug and mental health issues; she has not taken advantage of multiple services offered by Health Connect America and she has failed to comply with conditions of probation, resulting in repeated incarcerations.

- 14 -

The record reflects that [Mother] has never filed anything in any court to regain custody of her children. Instead, she failed to take advantage of the services offered to her, to help stabilize her life, to see her children; and to show the court she could be a good parent.

The Court finds that DCS has carried its burden of proof as to this ground, and finds that [Mother] has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of her children. Further, the Court finds that placing the children in her legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children.

Best Interest of the Children:

The Court finds by clear and convincing evidence that termination is in the best interest of the children.

* * *

The Court finds that [Mother] has failed to make an adjustment of circumstances, conduct or conditions as to make it safe and in the children's best interest to be in any home with her. [Mother] has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for some 20 months; therefore, lasting adjustment does not reasonably appear possible. [Mother] admits she has not "done nothing" to work with social services; however, she asks for another chance. [Mother] stated: "I'm their mother and they deserve having me in their lives."

The Court finds that [Mother] has failed to maintain regular therapeutic visitation, despite considerable efforts by Health Connect America.

The Court finds that even if there might be some degree of relationship between [Mother] and the children, it questions whether [Mother] will be successful in continuing a close and meaningful relationship with her children due to her failure to address mental health issues, her involvement with abusive males, and her continuing use of serious, illegal drugs.

The children have been in foster care for some 19 months. The Court heard from [G.M.], foster mother of the children since December 15,

- 15 -

2018. [G.M.] is divorced; however, her ex-husband and she are attempting to slowly reunify. He is playing a major role in the children's lives and very supportive of efforts to adopt them. [G.M.] is a substitute teacher for the Hardin County Board of Education; she drives a school bus and is involved in International Foreign Student Exchange.

She testified that the children fit right in to the household and are "precious." Both children have some upper respiratory problems. Noah was diagnosed with microcephaly, where his head is smaller than normal. His a little delayed; he has speech, occupational and physical therapy on a weekly basis, and he is progressing. At first Noah had night terrors, and there were issues with his temper and defiance. This, also, is better.

The Court finds a change of caretakers and physical environment will have a profound negative effect on both children, emotionally and psychologically.

The Court does not know where [Mother] be living from day to day. Her life has proved to be chaotic and in turmoil; she moves from men to men in sexual relationships; she refuses to address mental health issues; she lies about current use of illegal drugs; there has been continuing domestic violence in her life.

[Mother] has not contributed to the financial support of her children, and failed to offer necessities.

The Court finds it is time to establish stability and permanency for these young children.

The Court finds DCS has carried its burden of proof by clear and convincing evidence that termination of [Mother's] parental rights is in the children's best interest.

(Other internal citations omitted.)

The Trial Court granted DCS's petition to terminate Mother's parental rights on the statutory grounds of abandonment by failure to visit prior to her incarceration, abandonment by wanton disregard, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plans, persistent conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility of the Children. The Trial Court further found that termination of Mother's parental rights was in the best interest of the Children. Mother timely appealed.

**Discussion**

Although not stated exactly as such, Mother raises the following issues for our review: (1) whether the Trial Court erred by considering out-of-court statements made by Father after he already had surrendered his parental rights to the Children, (2) whether the Trial Court erred by admitting Noah's drug test results, (3) whether the Trial Court erred by calculating the four-month period for purposes of the ground of abandonment for failure to visit, (4) whether the Trial Court erred in finding by clear and convincing evidence that statutory grounds existed for termination of Mother's parental rights, and (5) whether the Trial Court erred in finding by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children.

With regard to the termination of parental rights, our Supreme Court has instructed:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id*.; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

- 18 -

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id.* If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

findings." *Id.* (citing *Adoption Place, Inc. v. Doe,* 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

We first address the issue raised by Mother concerning whether the Trial Court erred by considering out-of-court statements by Father in the trial concerning termination of Mother's parental rights. Mother argues that because Father had surrendered his parental rights, he was no longer a party to the action and his out-of-court statements should not have been admitted for the truth of the matter asserted. DCS, however, argues that Mother has waived this argument due to her failure to comply with Tennessee Rule of Appellate Procedure 27.

A party's failure to comply with the appellate brief requirements set forth in Tennessee Rule of Appellate Procedure 27 can have serious consequences, as we have warned repeatedly:

Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue. *See State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997); *Rampy v. ICI Acrylics, Inc.*, 898 S.W.2d 196, 210 (Tenn. Ct. App. 1994); *State v. Dickerson*, 885 S.W.2d 90, 93 (Tenn. Crim. App. 1993). Moreover, an issue is waived where it is simply raised without any argument regarding its merits. *See Blair v. Badenhope*, 940 S.W.2d 575, 576-577 (Tenn. Ct. App. 1996); *Bank of Crockett v. Cullipher*, 752 S.W.2d 84, 86 (Tenn. Ct. App. 1988). . . . As noted in *England v. Burns Stone Company, Inc.*, 874 S.W.2d 32, 35 (Tenn. Ct. App. 1993), parties cannot expect this court to do its work for them. This Court is under no duty to verify unsupported allegations in a party's brief, or for that matter consider issues raised but not argued in the brief. *Duchow v. Whalen*, 872 S.W.2d 692, 693 (Tenn. Ct. App. 1993) (citing *Airline Const. Inc. v. Barr*, 807 S.W.2d 247 (Tenn. Ct. App. 1990)).

*Bean v. Bean*, 40 S.W.3d 52, 55-56 (Tenn. Ct. App. 2000).

In Mother's appellate brief, she argues that the Trial Court erred by admitting "several" out-of-court statements by Father. However, Mother fails to cite to the record where these statements occurred or even to describe these statements by Father. Furthermore, Mother also has failed to present an argument concerning how the admission of those out-of-court statements was detrimental to her at trial given the rest of the evidence presented as to grounds and best interest. As such, we determine that Mother has waived this issue on appeal.

We next address Mother's second issue on appeal as to whether the Trial Court erred by admitting as an exhibit during trial Noah's medical records, specifically a drug screen. During trial, Mother objected to admittance of the records for lack of a foundation and relevance. On appeal, Mother argues that she was not provided with the records at least sixty days prior to trial as required by Tennessee Code Annotated § 24-7-122. Mother failed to raise the issue of lack of notice or violation of this statute during trial, and we, therefore, find that she has waived that issue on appeal because it was not raised in the proceedings below.

Mother did object at trial as to the foundation laid for admittance of the records. Therefore, we will address whether DCS laid a proper foundation to support admission of the drug test records as an exception to the hearsay rule. When arriving at a determination to admit or exclude evidence, a trial court generally is accorded a wide degree of latitude and will be overturned on appeal only where there is a showing of abuse of discretion. *Otis v. Cambridge Mutual Fire Ins. Co.,* 850 S.W.2d 439, 442

(Tenn. 1992) (holding "admissibility of evidence is within the sound discretion of the trial judge").

Tennessee Rule of Evidence 803(6) provides an exception to the hearsay rule for business records as follows:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . , unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

Additionally, Tennessee Rule of Evidence 902(11) allows admission of records deemed admissible under Tennessee Rule of Evidence 803(6) and accompanied by an affidavit by the custodian of records certifying the record:

(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of and a business duty to record or transmit those matters;

(B) was kept in the course of the regularly conducted activity; and

(C) was made by the regularly conducted activity as a regular practice.

On appeal, Mother argues that the trial court erred by admitting the drug screen as an exhibit at trial. We disagree. Accompanying the drug test record was an affidavit signed by the custodian of records for Southern Tennessee Pediatrics demonstrating compliance with Tennessee Rules of Evidence 803(6) and 902(11). Furthermore, this Court has previously allowed the admission of a child's hair follicle drug test results as a business record exception to the hearsay rule. *See In re Mason E.*, No. E2015-01256-COA-R3-JV, 2016 WL 2931190, at *4 (Tenn. Ct. App. May 16, 2016) (holding that despite pending litigation, the requirements of Rule 803(6) had been met and the trial court had not abused its discretion by admitting the child's hair follicle drug test results under the business records exception). As such, we determine that the Trial Court did not abuse its discretion by admitting Noah's drug test results under the business record exception.

We next address Mother's argument that the Trial Court erred in its calculation of the four-month period for purposes of abandonment for failure to visit. The Trial Court calculated two four-month periods, one period consisting of the four months prior to Mother's January 2018 incarceration and another four-month period aggregating the time Mother had spent between incarcerations. The Trial Court identified these periods as follows:

(1)  A consecutive period from September 29, 2017 to January 29, 2018, or

(2)  An aggregated period of October 29, 2017, to January 29, 2018, plus the period of February 23, 2018, to March 27, 2018.

The termination petition was filed on June 29, 2018. Mother was incarcerated from January 20, 2018 through February 22, 2018. Thereafter, Mother became incarcerated on March 28, 2018, and remained incarcerated when the termination petition was filed. Tennessee Code Annotated § 36-1-102(1)(A)(iv) provides that if the four-month period prior to the petition's filing or the parent's incarceration is interrupted by a period or periods of the parent's incarceration "and there are not four (4) consecutive months without incarceration immediately preceding either event," the applicable four-month period shall be determined by "aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time."

In this case, because Mother was incarcerated at the time the petition was filed and there are not four consecutive months prior to her incarceration, the correct method of calculating the four-month period for purposes of abandonment is the aggregated period of time consisting of Mother's periods of nonincarceration. Although it would have been the better option for the Trial Court to identify and analyze only the correct time period instead of analyzing two alternative time periods, we find any such error to be harmless. The Trial Court's findings concerning this ground included the correct four-month period.

We next address the grounds for termination of Mother's parental rights. On appeal, Mother raises an issue concerning the grounds for termination of her parental rights. Mother includes a one-and-a-half-page argument section, essentially arguing that the Trial Court erred in finding grounds for termination of Mother's parental rights because the Trial Court relied upon improperly admitted evidence, specifically out-of-court statements by Father and the drug test results of Noah. We already have addressed these issues raised by Mother and have concluded that no reversible error exists by the Trial Court on those issues. Although Mother does not otherwise raise issues concerning specific grounds for termination of her rights, we will proceed to review the Trial Court's

findings of fact and conclusions of law for each statutory ground for termination of Mother's parental rights, as instructed by our Supreme Court in *In re Carrington H.*, 483 S.W.3d at 525-26.

Concerning abandonment by failure to visit by an incarcerated parent, the version of Tennessee Code Annotated § 36-1-102(1)(A)(iv) in effect at the time of the termination petition's filing defines abandonment as follows in relevant part:

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . has willfully failed to visit . . . for four (4) consecutive months immediately preceding such parent's or guardian's incarceration . . . . If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time. Periods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration. Periods of incarceration not discovered by the petitioner and concealed, denied, or forgotten by the parent shall also be counted as periods of nonincarceration. A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment[.]

Pursuant to Tennessee Code Annotated § 36-1-102(1)(E), a parent must have failed to visit or engage in more than token visitation during the relevant four-month period. Tennessee Code Annotated § 36-1-102(1)(C) defines "token visitation" as visitation that under the circumstances of the particular case, "constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child."

In the present case, Mother was incarcerated at the time the petition was filed. During the relevant time period, Mother was permitted supervised therapeutic visitation with the Children. Analyzing the aggregated time period constituting four months of nonincarceration, the Trial Court correctly identified Mother's two visits during that

- 24 -

timeframe. One visit occurred in November 2017, and the second visit occurred in December 2017. These visits consisted of a total of five hours. The Trial Court found those visits to be token visitation. The Trial Court further found that Mother was aware of her duty to visit the Children, had the capacity to visit, did not make sufficient attempts to visit, and had no justifiable excuse for not visiting. The evidence presented does not preponderate against the Trial Court's findings of fact. We find and hold, as did the Trial Court, that the ground of abandonment by Mother's failure to visit the Children was established by clear and convincing evidence.

We next address the statutory ground of abandonment by wanton disregard. As relevant to this ground, Tennessee Code Annotated § 36-1-102(1)(A)(iv) provides in pertinent part:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Mother was incarcerated at the time the termination petition was filed. During trial, DCS admitted as an exhibit Mother's criminal records demonstrating Mother's extensive criminal history. Mother was sentenced to eleven months and twenty-nine days of supervised probation in November 2015. Noah was subsequently born in April 2016.

Mother's probation officer filed a violation of probation in June 2016, alleging that Mother had failed to obey the law by incurring new criminal charges relating to the manufacturing of methamphetamine and that Mother had failed to refrain from the use of illegal drugs. According to the affidavit, Mother had failed a drug screen in June 2016 for alprazolam, amphetamine, and methamphetamine. In September 2016, Mother acknowledged that the rules of her probation had been violated and the court revoked her probation. Mother was sentenced to sixty days incarceration and her probation was reinstated and extended. Mother received a second violation of her probation in October 2016. Mother failed to report to her probation officer, incurred new criminal charges of domestic assault and violation of conditional bond, and failed to refrain from illegal drug use. Mother's drug screen indicated the presence of marijuana. In December 2016, the court revoked Mother's probation and ordered her to serve eleven months and twenty-nine days incarceration.

In November 2016, Mother pled guilty to promotion of methamphetamine manufacturing and was sentenced to ninety days incarceration and four years of supervised probation. In April 2017, Mother pled guilty to domestic assault against

- 25 -

Father and violation of a conditional bond. As a result of these convictions, Mother was sentenced to eleven months and twenty-nine days of supervised probation. Mother was subsequently released from jail on probation, and Gracie was born in May 2017.

In January 2018, Mother violated her probation due to testing positive on a drug screen for amphetamine, methamphetamine, and marijuana. Mother's probation was partially revoked in February 2018. Mother was required to serve thirty days incarceration and her probation was reinstated. Mother again violated her probation in March 2018 after she failed a drug screen for amphetamine and methamphetamine. Mother's probation was partially revoked, and she was ordered to serve one year of incarceration and ordered to community correction for the remainder of her sentence.

Furthermore, Mother continued to use illegal drugs throughout the time the Children were in DCS custody. In September 2018, Mother was allowed a furlough from her incarceration in order for her to attend long-term drug treatment. However, Mother was "kicked out of rehab" and her furlough was revoked. The Trial Court found that Mother testified that she did not need drug treatment and that she only entered the program to regain custody of the Children. Mother began attending an intensive outpatient drug treatment program the Thursday before trial. However, when given a drug test on the day of trial, Mother tested positive for methamphetamine and amphetamines, which was confirmed by laboratory testing.

This Court has held previously that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). As the Trial Court found, Mother had abandoned the Children through her wanton disregard of their welfare by "engaging in illegal drug use, by exposing the children to drugs and domestic violence, by failing to comply with requirements order[ed] by the juvenile court in order to regain custody of her children, by continuing her drug usage after removal of her children, and by continuing to engage in criminal activities, resulting in incarceration and continuous separation from her children." We find and hold, as did the Trial Court, that the ground of abandonment by wanton disregard was established by clear and convincing evidence.

We next address the statutory ground of abandonment by failure to provide a suitable home. Concerning this ground, Tennessee Code Annotated § 36-1-102(1)(A)(ii) provides:

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined

in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

In order for this ground to be proven by clear and convincing evidence, the Trial Court must find that DCS made reasonable efforts to assist Mother in the four months immediately following removal of the Children. *See In re Kaliyah S.*, 455 S.W.3d 533, 555 n.32 (Tenn. 2015) ("[P]roof of reasonable efforts is required to prove the ground of abandonment by failure to provide a suitable home."). The Trial Court failed to make specific findings as to this ground concerning DCS's efforts during the relevant four-month period. Because the Trial Court did not make sufficient findings to support this ground, we reverse the Trial Court's termination of Mother's parental rights on this ground.

We next address the statutory ground of substantial noncompliance with the permanency plan requirements. As to this ground, Tennessee Code Annotated § 36-1-113(g)(2) provides:

There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]

The requirements of the court-approved permanency plans required Mother to (1) provide safe, appropriate, and stable housing and provide proof thereof; (2) notify DCS regarding a change in housing or telephone number; (3) comply with the rules of her probation; (4) have a stable, legal income; (5) notify DCS within seven days of any individuals residing in her home; (6) complete budgeting services; (7) pay child support;

(8) complete homemaker services; (9) sign releases with provider agencies; (10) complete a mental health assessment and follow all recommendations; (11) complete an alcohol and drug assessment and comply with all recommendations; (12) complete domestic violence counseling; (13) visit the Children regularly and comply with parenting guidance; and (14) comply with and pass random drug screens. The Juvenile Court found those requirements were reasonably related to the reasons that necessitated foster care and were in the Children's best interest.

During the time the Children were in foster care, Mother failed to visit the Children consistently. She had not maintained stable housing for the Children. Mother had a legal income when she was not incarcerated but she had not financially supported the Child. Mother continued to fail drug screens throughout the time her Children were in DCS custody. She did not substantially comply with homemaker services or domestic violence counseling. Additionally, Mother has consistently failed to comply with the rules of her probation. Mother was granted a furlough to attend inpatient drug treatment in September 2018 but was "kicked out" three days later. Although Mother began intensive outpatient drug treatment after her release from jail in December 2018, she was subsequently discharged for lack of participation in January 2019. Mother failed to complete a mental health assessment to address her mental health issues. Mother made very little progress throughout the case toward the requirements on her permanency plan. We find and hold, as did the Trial Court, that DCS had proven by clear and convincing evidence that Mother failed to substantially comply with the requirements of the permanency plans.

We next address whether the Trial Court erred in finding by clear and convincing evidence that the conditions leading to the Children's removal from the parents persisted. Although the statute at issue has since been amended, the version of Tennessee Code Annotated § 36-1-113(g)(3) (2018) that was in effect at the time of the termination petition's filing and is applicable to the current proceeding stated as follows:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

In this case, the Children were removed from Mother's custody due to Mother's drug use and a physical assault against Noah by Mother's boyfriend. Since that time, Mother's drug use has continued, and Mother tested positive on a drug test for methamphetamine and amphetamines at trial. As of the date of trial, Mother had failed to complete drug treatment to address her drug abuse issues. Additionally, Mother failed to address her mental health issues. The Trial Court found that the Children had been in DCS custody for nineteen months; that the conditions that led to the Children's removal from Mother's custody still persist and have prevented the Children from returning safely to Mother's custody; and that other conditions exist that, in all reasonable probability, would lead to further abuse to the Children if returned to Mother. The Trial Court further found that there was little likelihood that these conditions would be remedied at any point in the near future such that the Children could safely return to Mother's custody and that continuation of the parent-child relationship greatly diminished the Children's chances at early integration into a safe, stable, and permanent home. The evidence presented at trial does not preponderate against the Trial Court's findings of fact in this regard. We find and hold, as did the Trial Court, that DCS proved this ground by clear and convincing evidence.

The final ground we address is the statutory ground of failure to manifest an ability and willingness to assume custody of the Children. Tennessee Code Annotated § 36-1-113(g)(14) (2018) provides:

A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Relative to this ground, the Trial Court found that Mother had not consistently visited the Children, had not financially supported the Children, and had not provided necessities for them. The Trial Court further found that Mother had not addressed her mental health issues, complied with the terms of her probation, or taken advantage of the multiple services offered to her throughout the case. Additionally, we note that Mother had continued using illegal drugs throughout the case and tested positive for methamphetamine and amphetamines at the time of trial. As such, the Trial Court found that Mother had failed to address her drug use issues. Based on the foregoing facts, the

Trial Court found that Mother, by clear and convincing evidence, had failed to manifest an ability and willingness to assume custody of the Children.

Additionally, based on the aforementioned facts, the Trial Court found that returning the Children to the Mother's custody would pose a substantial risk of harm to the Children's physical or psychological welfare. We agree. This Court has previously found that a risk of substantial harm existed when returning the children to the parent could expose the children to drug use or domestic violence, *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018), or when the parent has knowingly engaged in repeated criminal conduct resulting in incarceration, *see In re Ke'Andre C.*, No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *11 (Tenn. Ct. App. Jan. 29, 2018). We find and hold, as did the Trial Court, that this ground has been proven by clear and convincing evidence.

Having determined that grounds exist for the termination of Mother's parental rights, we next address the best interest analysis. Tennessee Code Annotated § 36-1-113(i) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

(i)  In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following

(1)  Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)  Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)  Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)  Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)  The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

- 30 -

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2019).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme"

evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

On appeal, Mother argues that the Trial Court failed to consider factor (4), which concerns whether a meaningful relationship exists between Mother and the Children. According to Mother's brief, "there exists a possibility that the mother-child relationship could have weighed in [Mother's] favor" but that the Trial Court did not consider this factor. The Trial Court's order, however, reflects that the Trial Court did consider this factor. The Trial Court found that "even if there might be some degree of relationship between [Mother] and the children, it questions whether [Mother] will be successful in continuing a close and meaningful relationship with her children due to her failure to address mental health issues, her involvement with abusive males, and her continuing use of serious, illegal drugs." We find that Mother's argument that the Trial Court failed to consider this factor to be unavailing.

In addition to the Trial Court's findings as to factor (4), the Trial Court found pursuant to factors (1) and (2) that Mother had admitted she had "not 'done nothing' to

work with social services." Mother had failed to address both her mental health and drug issues. Mother had failed to make an adjustment to her circumstances despite efforts by social service agencies such that a lasting change by Mother does not reasonably appear possible. Without such change, the Trial Court found that it was not safe or in the Children's best interest to be returned to Mother's home.

Pursuant to factor (3), Mother had failed to maintain regular visitation with the Child despite "considerable efforts" by the service provider. As relevant to factor (5), the Trial Court found that the Children "fit right in" with the foster home, who wish to adopt them. Both Children had existing health conditions. Noah had some developmental delays and was in speech, occupational, and physical therapy on a weekly basis. Noah also had night terrors and issues with defiance and controlling his temper. However, the Trial Court found that Noah's delays and behavioral issues had both improved. The Trial Court found that the Children need stability and permanency. As such, the Trial Court found that changing the Children's caretakers would have a detrimental effect on them, both emotionally and psychologically.

Concerning factor (7), the Trial Court further found that Mother does not have a stable home for the Children and Mother's life "has proved to be chaotic and in turmoil." As the Trial Court found, Mother had failed to address both her ongoing drug issues and mental health problems. The Trial Court explained that Mother failed to acknowledge she had a drug problem, lied about her current use of illegal drugs, and had continuing domestic violence in her life. Additionally, Mother had participated in ongoing criminal activity resulting in several incarcerations throughout the case. The Trial Court found that Mother had not financially supported the Children pursuant to factor (9).

Upon its consideration of the best interest factors, the Trial Court concluded that DCS had proven by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest. Upon our review of the record on appeal, we determine that the evidence presented does not preponderate against the Juvenile Court's findings and that those findings are clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. We, therefore, affirm the Trial Court's judgment terminating Mother's parental rights to the Children.

## Conclusion

The judgment of the Trial Court as to the statutory ground of abandonment by failure to provide a suitable home is reversed. All the rest of the Trial Court judgment, including terminating Mother's parental rights to the Children, is affirmed, and this cause is remanded to the Trial Court for collection of the costs assessed below. The costs on appeal are assessed against the appellant, Ashley H., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE